# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Peter Gathiru,                    Case No. 15-cv-4247 (DSD/TNL)

            Petitioner,

v.

Scott Banieke,                             **REPORT &**
Field Officer, U.S. Immigration & Customs     **RECOMMENDATION**
Enforcement (ICE),

Michael Feinberg,
Special Agent in Charge, (ICE),

Jeh Johnson,
Secretary, Department of Homeland Security,
and

Joel Brott,
Sheriff of Sherburne County,

            Respondents.

Marc Prokosch, Karam & Associates, 2950 Metro Drive, Suite 201, Bloomington, MN 55425 (for Petitioner);

D. Gerald Wilhelm, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Respondents Scott Banieke, Michael Feinberg, and Jeh Johnson); and

Joel Brott.

# I. INTRODUCTION

This matter comes before the Court on Petitioner Peter Gathiru's Petition for Writ of Habeas Corpus (ECF No. 1). Petitioner is represented by Marc Prokosch.

Respondents Scott Banieke, Michael Feinberg and Jeh Johnson are represented by Assistant United States Attorney D. Gerald Wilhelm.  For purposes of these proceedings, the Court will collectively refer to Respondents Banieke, Feinberg, and Johnson under the umbrella of the Department of Homeland Security's Immigration and Customs Enforcement division ("ICE").[1]  This matter has been referred to the undersigned for a report and recommendation to the Honorable David S. Doty, District Judge for the United States District Court for the District of Minnesota, pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.  For the reasons that follow, the Court recommends that the petition be dismissed without prejudice.

## II. BACKGROUND

Petitioner is a native and citizen of Kenya.  (Pet. ¶ 4, 9, ECF No. 1; Decl. of Dennis Olson ¶ 2, ECF No. 9; Bd. of Imm. Appeals Order at 1, Ex. 1 to Olson Decl. at 25, ECF No. 9-1.)  Petitioner entered the United States in 2004 on a B-1 visa, which permitted him to stay for up to six months.[2]  (Olson Decl. ¶ 7; Notice to Appear, Ex. 1 to Olson Decl. at 1.)  Petitioner remained in the United States beyond the six-month period and, in 2006, was directed to appear before an Immigration Judge to show why he should not be removed.  (Olson Decl. ¶ 9; Notice to Appear.)  Petitioner failed to appear at the October 2006 hearing and was ordered removed to Kenya.  (Olson Decl. ¶ 10; Oct. 10, 2006 Order of Immigration Judge, Ex. 1 to Olson Decl. at 3; Pet. ¶ 4.)  A warrant was

---

[1] Respondent Joel Brott has not appeared in this matter.  Because the Court recommends that the petition be dismissed without prejudice and because Petitioner is no longer in Respondent Brott's custody, the Court does not separately address Respondent Brott.  *See infra* n.4 and accompanying text.

[2] In the brief in support of his petition, Petitioner states that he "was in the United States around 2002/2003 but . . . is recorded as . . . having entered the United States on a nonimmigrant B1 on or about February 15, 2004."  (Brief in Supp. of Pet. at 1-2, ECF No. 10.)

issued for Petitioner's arrest and detention.   (Olson Decl. ¶ 11; Warrant of Removal/Deportation, Ex. 1 to Olson Decl. at 4.)

Approximately eight years later, in August 2014, Petitioner was discovered while detained at the Wright County Jail in Buffalo, Minnesota.  (Olson Decl. ¶ 12; Record of Deportable/Inadmissible Alien at 2, Ex. 1 to Olson Decl. at 6.)   Petitioner was then placed into ICE custody.  (Olson Decl. ¶ 13; *see* Warrant for Arrest of Alien, Ex. 1 to Olson Decl. at 8; Pet. ¶¶ 4, 10.)

Petitioner subsequently initiated a series of legal proceedings.   Petitioner simultaneously appealed the 2006 removal order to the Ninth Circuit Court of Appeals and sought to have the removal proceedings reopened in Immigration Court.  (Olson Decl. ¶¶ 14-15; *see* Sept. 15, 2014 Order of Immigration Judge, Ex. 1 to Olson Decl. at 9; March 23, 2015 Order of the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit Order"), Ex. 1 to Olson Decl. at 28; *see also* Ex. 2 to Olson Decl., ECF No. 9-2.) Petitioner also filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Washington.  (Olson Decl. ¶ 18; *see* Judgment in a Civil Case, Ex. 4 to Olson Decl., ECF No. 9-4.)  *See Gathiru v. Holder*, No. C14-1394-JLR (W.D. Wash.).

The petition for a writ of habeas corpus was dismissed without prejudice for failure to prosecute in November 2014.  (Olson Decl. ¶ 18; Judgement in a Civil Case.) Around the same time, ICE reviewed Petitioner's custody status.  (November 2014 Decision to Continue Detention, Ex. 1 to Olson Decl. at 10; *see* Ex. 1 to Olson Decl. at 11-21.)  ICE determined that Petitioner's detention should continue because Petitioner

3

"appear[ed] to be a threat to the community if released from ICE custody based upon [his] serious criminal history" and his "removal [wa]s likely to occur in the reasonably foreseeable future" given ICE's efforts to obtain a travel document for Petitioner. (November 2014 Decision to Continue Detention.)

The Immigration Judge denied Petitioner's motion to reopen the removal proceedings, and the Board of Immigration Appeals affirmed the Immigration Judge's decision in February 2015. (Olson Decl. ¶¶ 13-17; Sept. 15, 2014 Order of Immigration Judge; Decision of Bd. of Immigration Appeals, Ex. 1 to Olson Decl. at 25.) The Ninth Circuit Court of Appeals dismissed Petitioner's appeal in March 2015 and issued its mandate in May 2015. (Olson Decl. ¶ 19; Ninth Circuit Order; Mandate of the United States Court of Appeals for the Ninth Circuit, Ex. 3 to Olson Decl., ECF No. 9-3; *see also* Ex. 2 to Olson Decl.)

Following the issuance of the mandate, ICE continued to work with Kenya to obtain a travel document for Petitioner's removal. (Olson Decl. ¶ 20.) Petitioner was advised by ICE of his obligation to cooperate in the removal process, including to assist in obtaining travel documents. (Olson Decl. ¶ 21; Instruction Sheet to Detainee Regarding Requirement to Assist in Removal, Ex. 1 to Olson Decl. at 32.) In June 2015, a telephonic interview was arranged for Petitioner with the Kenyan consulate in New York. (Olson Decl. ¶ 22.) Petitioner refused to speak with the Kenyan officials. (Olson Decl. ¶ 22.)

ICE conducted another review of Petitioner's custody status in August 2015, again continuing his detention. (August 2015 Decision to Continue Detention, Ex. 1 to Olson

Decl. at 33; *see* Ex. 1 to Olson Decl. at 34-44.)  Petitioner's criminal history remained the

focus.  ICE stated:

> As a result of your past criminal behavior which includes
> violence during assaults and failure to provide information to
> law enforcement, it appears you may be a continued threat to
> the community as well as a flight risk.  Based on your
> criminal history, you are to remain in ICE custody.

(August 2015 Decision to Continue Detention.)

The Kenyan consulate conducted travel-document-related interviews with

Petitioner in September and November 2015.  (Olson Decl. ¶¶ 23-24; *see* Comments, Ex.

1 to Olson Decl. at 48-49.)  At the end of the September interview, the Kenyan official

informed ICE that Petitioner "was evasive and not willing to consent to the questions that

were being asked of him in order to receive a [travel document]."  (Comments; *see* Olson

Decl. ¶ 23.)  During the November interview, Petitioner told the Kenyan consulate that he

had been assaulted and was denied medical attention.[3]  (Olson ¶ 24; *see* Comments.)  The

Kenyan official informed ICE that he intended to fly to Minnesota to speak with

Petitioner directly concerning Petitioner's medical care.  (Comments; *see* Olson Decl.

¶ 24.)

Petitioner met with Kenyan officials in early December 2015.  (Comments.)

During the interview, the Kenyan officials "were able to collect information from

[Petitioner] about the location of his parents in Kenya which they said will be used in

determining the issuance of a travel document if they can verify the information."

---

[3] It appears that Petitioner was involved in an altercation with another inmate in late October 2015.  (*See* Pet'r's Ex.
B, ECF No. 11-2.)  Petitioner was struck in the head, which caused pain and affected his eyesight.  (Pet'r's Ex. A at
1; Pet'r's Ex. B at 5, 7.)

(Comments; *see* Olson Decl. ¶ 25.)   ICE conducted another custody review shortly thereafter.  (December 2015 Decision to Continue Detention, Ex. 1 to Olson Decl. at 45; *see* Ex. 1 to Olson Decl. at 46-47.)   ICE stated that it was "currently working with the government of Kenya to secure a travel document for [Petitioner's] removal" and, because ICE expected to receive a travel document for Petitioner, Petitioner was to remain in custody.  (December 2015 Decision to Continue Detention.)  In the comments portion of a review checklist, an ICE officer noted that he "ha[d] spoken to [his] contacts at the Kenyan Embassy and after [their] conversation, it appeared likely that a [travel document] would issue."  (HQ POCR Checklist, Ex. 1 to Olson Decl. at 46.)

At the time Petitioner filed the instant habeas petition in this District, he was confined at the Sherburne County Jail in Minnesota.  (Pet. ¶¶ 3, 10.)  Sometime later, Petitioner was transferred from Minnesota to the Douglas County Department of Corrections in Nebraska.[4]   Online Detainee Locator System, U.S. Immigration &

---

[4] Although Petitioner has been transferred to a Nebraska facility, this Court still retains jurisdiction over his habeas petition because Petitioner was confined at a Minnesota facility at the time the petition was filed.  *Mehighlovesky v. U.S. Dep't of Homeland Security*, No. 12-cv-902, 2012 WL 6878901, at *1 n.2 (D. Minn. Dec. 7, 2012) (district court in Minnesota retained jurisdiction despite ICE's transfer of detainee to Alabama), *adopting report and recommendation*, 2013 WL 187553 (D. Minn. Jan. 17, 2013); *see Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004) ("[*Ex parte*] *Endo*[, 323 U.S. 283 (1944),] stands for the important but limited proposition that when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release."); *see also Copley v. Keohane*, 150 F.3d 827, 830 (8th Cir. 1998) (subsequent transfer of habeas petitioner will not strip court of jurisdiction over petition); *McCoy v. U.S. Bd. of Parole*, 537 F.2d 962, 966 (8th Cir. 1976) (same).  "In the immigration context, unlike the state and federal prisoner contexts, the courts have not yet resolved the question of which entity should be named as the 'custodian' for purposes of a federal habeas corpus petition and the corollary question of where such a petition can be filed."  2 Randy Hertz and James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 42.2 (7th ed. 2015); *see Padilla*, 542 U.S. 435 n.8 (noting lower courts are divided on whether the Attorney General is proper respondent to a habeas petition filed by alien detained pending deportation and declining to resolve question).  Despite Petitioner's physical confinement at a facility in Nebraska, it bears mentioning that responsibility for ICE detainees at this facility is maintained by ICE's St. Paul Field Office, located in Fort Snelling, Minnesota.  Douglas Cnty. Dep't of Corr., Detention Facilities, U.S. Immigration & Customs Enforcement, https://www.ice.gov/detention-facility/douglas-county-department-corrections (listing St. Paul Field Office); Enforcement and Removal Operations

Customs Enforcement, https://locator.ice.gov/odls/homePage.do (under "Search by A-Number," enter 098532112 in "A-Number"; select Kenya as "Country of Birth"; and click "Search by A-Number").

### III. ANALYSIS

Petitioner has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging his continued detention by ICE. Petitioner contends that his continued detention is unlawful under *Zadvydas v. Davis*, 533 U.S. 678 (2001), and requests that he be released with appropriate conditions until ICE is able to arrange for his removal to Kenya.

#### A.  Post-Removal Detention & *Zadvydas*

Petitioner has been ordered removed from the United States. By statute, ICE is ordinarily required to secure the removal of aliens like Petitioner within a 90-day "removal period." 8 U.S.C. § 1231(a)(1)(A); *Zadvydas*, 533 U.S. at 682. During this removal period, ICE is required to "detain the alien." 8 U.S.C. § 1231(a)(2). But, if removal does not take place within the removal period, § 1231(a)(6) permits ICE to continue detaining certain classes of aliens, including those determined "to be a risk to the community or unlikely to comply with the order of removal." *Id.* § 1231(a)(6); *see Bah v. Cangemi*, No. 06-cv-3260, 489 F. Supp. 2d 905, 915 (D. Minn. 2007) ("The language of § 1231(a)(6) is permissive, not restrictive."), *transferred and dismissed*, 521

---

Field Offices, U.S. Immigration & Customs Enforcement (listing Nebraska in areas of responsibility for St. Paul Field Office, located in Fort Snelling, Minnesota).

F.3d 857 (8th Cir. 2008). ICE justified Petitioner's continued detention on these grounds

as well as the likelihood that Kenya would issue a travel document for Petitioner.

On its face, § 1231(a)(6) can be read to authorize "indefinite and potentially

permanent" detention. *Zadvydas*, 533 U.S. at 689-90, 696; *Chen v. Banieke*, No. 15-cv-

2188 (DSD/BRT), 2015 WL 4919889, at *3 (D. Minn. Aug. 11, 2015); *see Bah*, 589 F.

Supp. 2d at 916. In *Zadvydas*, however, the Supreme Court construed § 1231(a)(6) to

"limit[] an alien's post-removal-period detention to a period reasonably necessary to

bring about that alien's removal from the United States" in order to comport with due

process. 533 U.S. at 689-90; *accord Chen*, 2015 WL 4919889 at *3. The Supreme Court

focused on "the statute's basic purpose"—"assuring the alien's presence at the moment of

removal." *Zadvydas*, 533 U.S. at 699. The Supreme Court held that if the alien's

removal was not reasonably foreseeable, his or her continued detention was unreasonable

and no longer lawful. *Id.* at 699-700.

"The Supreme Court went on to hold that it is presumptively reasonable to keep an

alien subject to a final removal order in custody for a total of six months." *Bah*, 489 F.

Supp. 2d at 916 (citing *Zadvydas*, 533 U.S. at 701). The Supreme Court explicitly stated

that this presumption "does not mean that every alien not removed must be released after

six months." *Zadvydas*, 533 U.S. at 701; *accord Bah v. Cangemi*, 548 F.3d 680, 685 (8th

Cir. 2008). Rather, "[a]fter this 6-month period, once the alien provides good reason to

believe that there is no significant likelihood of removal in the reasonably foreseeable

future, the Government must respond with evidence sufficient to rebut that showing."

*Zadvydas*, 533 U.S. at 701. The Supreme Court additionally observed that "as the period

of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.* Ultimately, the Supreme Court held that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

### B. *Zadvydas* As Applied to Petitioner

In Petitioner's case, the removal period began in mid-May 2015, on the day the Ninth Circuit Court of Appeals issued its mandate. *See* 8 U.S.C. § 1231(a)(1)(B)(ii) ("If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, [the removal period begins on] the date of the court's final order."). Petitioner has been in post-removal detention now for 15 months. There is no dispute that Petitioner has been detained beyond *Zadvydas*'s six-month presumption.

*Zadvydas*, however, is not a magical clock. *See* 533 U.S. at 701. ICE may continue to detain Petitioner "until it has been determined that there is no significant likelihood of [his] removal in the reasonably foreseeable future." *Id.* Petitioner thus must "provide[] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* ICE contends that Petitioner cannot meet this initial burden.

ICE contends that Petitioner has pleaded "no facts to support his bare contention that his detention is unreasonable." (Resp. to Pet. at 6, ECF No. 8.) Further, ICE contends that Petitioner failed to cooperate in his removal, including refusing to speak with Kenyan officials and, when he did, giving evasive answers and being uncooperative during the interview. (Resp. to Pet. at 6-7.) Such noncooperation, which ICE contends

lasted for approximately six months (roughly June to December 2015), can extend the removal period.  (Resp. to Pet. at 7.)  *See* 8 U.S.C. § 1231(a)(1)(C) ("The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.").  Lastly, ICE contends that Petitioner's removal is imminent.  (Resp. to Pet. at 7-8.)

In attempting to meet his initial burden to show good reason to believe that there is no significant likelihood of his removal in the reasonably foreseeable future, Petitioner essentially relies on the passage of time, i.e., he has not been provided with a clear removal date and Kenya has not yet issued him a travel document.  (Brief in Supp. of Pet. at 7.)  When a foreign country delays issuing travel documents "for an extraordinarily long period" of time, it may be possible to infer "that documents will not issue at all, and thus that there is no significant likelihood of removal."  *Jaiteh v. Gonzales*, No. 07-cv-1727 (PJS/JJG), 2008 WL 2097592, at *3 (D. Minn. Apr. 28, 2008), *adopting report and recommendation*, 2008 WL 2074163 (D. Minn. May 14, 2008); *accord Ahmed v. Brott*, No. 14-cv-5000 (DSD/BRT), 2015 WL 1542131, at *4 (D. Minn. Mar. 17, 2015), *adopting report and recommendation*, 2015 WL 1542155 (D. Minn. Apr. 7, 2015).  Stated differently, "at some point in time the inability to procure travel documents may provide 'good reason' to believe that removal is unlikely to be carried out."  *Joseph v. United States*, 127 F. App'x 79, 82 (3d Cir. 2005) (per curiam).  But the mere passage of time is not sufficient to create such an inference.  *Chen*, 2015 WL 4919889, at *4 (citing

10

cases); *see, e.g.*, *Ahmed*, 2015 WL 1542131, at *4 ("The delays encountered thus far by the government are not alone sufficient to trigger an inference that there is no significant likelihood of removal . . . .").

Notwithstanding evidence in the record to the contrary, the Court will assume for purposes of these proceedings only that Petitioner has been fully cooperative in efforts to effectuate his removal and that the entire period of time since the Ninth Circuit issued its mandate should be considered.  Even with this assumption, however, Petitioner's 15-month period of post-removal detention has not been so "extraordinarily long" as to create an inference that travel documents will not issue and there is no significant likelihood of removal.  *See Jaiteh*, 2008 WL 2097592, at *2 (over 14 months in post-removal detention); *see also, e.g.*, *Joseph*, 127 F. App'x at 80 (more than 11 months post-removal detention); *Chen*, 2015 WL 4919889, at *5 (over 9 months post-removal detention); *Ahmed*, 2015 WL 1542131, at *3 (9 months post-removal detention); *Nabil v. Holder*, Civil Action No. JFM-10-1786, 2010 WL 4485894, at *3 (D. Md. Nov. 9, 2010) (over 12 months post-removal detention); *Khan v. Fasano*, 194 F. Supp. 2d 1134, 1135 (S. D. Cal. 2001) (nearly 9 months post-removal detention).  During these 15 months, ICE has arranged several meetings with Kenyan officials, both telephonically and in person.  Following the most recent of these meetings in December 2015, Kenyan officials obtained information from Petitioner that, once verified, would be used to determine whether a travel document would be issued.  Around the same time, comments in a custody-review document indicate that a travel document will likely issue based on a conversation with Kenyan officials.

Petitioner contends that *Bah* is on point because "ICE has not provided a clear indication of [his] removal date." (Brief in Supp. of Pet. at 7.) In *Bah*, the district court found that Bah had met his burden to show that his removal was not significantly likely in the reasonably foreseeable future based on the government's representation to Bah in August 2005 that his removal was scheduled for the near future; Bah's removal to Liberia had been scheduled via a flight in September 2005; the removal did not occur because Liberia had not issued travel documents; and, during a custody review six months later, Bah was told only that there was "'no indication at this time' that Liberia would not issue travel documents." 489 F. Supp. 2d at 911, 923. The government responded with an affidavit from ICE's local field office director, indicating that Liberia had issued travel documents in the past, this process was "historically slow," and there was no indication that Liberia would not issue a travel document for Bah. *Id.* at 923.

The district court found that the government's "only factual assertion related specifically to Bah's case [wa]s a double negative: Liberia has *not* told ICE that it would *not* issue a travel document." *Id.* The district court further found that, while the "[o]ther factual assertions—Liberia's slowness in issuing travel documents—may explain why Bah has not yet been removed, . . . they do not demonstrate that his removal is significantly likely in the reasonably foreseeable future." *Id.* Accordingly, the district court found that Bah was entitled to habeas relief under *Zadvydas* and ordered Bah released from custody subject to appropriate conditions. *Id.* at 923-24.

Petitioner's case is distinguishable because ICE has provided evidence that Petitioner's removal is significantly likely in the reasonably foreseeable future. ICE has

12

brought forth evidence that, upon verification of the information that Petitioner provided to the Kenyan officials, a determination can be made on whether a travel document will issue and it appears likely that a travel document would issue. *See Jaiteh*, 2008 WL 2097592, at *3 ("If travel documents are pending before a foreign government, and a consular official suggests that the documents are forthcoming, this Court cannot find *no* significant likelihood of removal."). Thus, unlike *Bah*, the record contains more concrete evidence regarding the significant likelihood of Petitioner's removal in the reasonably foreseeable future than an extrapolated hypothesis premised on a double-negative.

Fundamentally, the inquiry under *Zadvydas* is "not whether the government has established a concrete timeframe for securing necessary travel documents," but "whether 'there is no significant likelihood of removal in the reasonably foreseeable future." *Chen*, 2015 WL 4919889, at *5 (quoting *Zadvydas*, 533 U.S. at 701). *Zadvydas* was concerned with circumstances approaching indefinite detention "where removal seems a remote possibility at best" and detention "has no obvious termination point." 533 U.S. at 690, 697; *accord id.* at 695 ("[T]he issue we address is whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States."); *Chen*, 2015 WL 4919889, at *4. "[F]or there to be *no* significant likelihood of removal in the foreseeable future, there must be some indication that the government is either unwilling or, due to seemingly insurmountable barriers, incapable of executing an alien's removal." *Ahmed*, 2015 WL 1542131, at *4; *accord Chen*, 2015 WL 4919889, at *4. At this time, there is no indication that Kenya is unwilling or otherwise incapable of effectuating Petitioner's removal in the reasonably

13

foreseeable future.  Petitioner has made no showing, for example, that Kenya is unwilling to issue a travel document to him; there is some institutional barrier to his repatriation; or that some other insurmountable impediment exists to his removal.  *See, e.g.*, *Louie v. Davies*, Civ. No. 15-6954 (KM), 2015 WL 8328435, at *3 (D. N.J. Dec. 7, 2015); *Chen*, 2015 WL 4919889, at *5; *Ahmed*, 2015 WL 1542131, at *4; *Fahim v. Ashcroft*, No. Civ.A.102CV338JEC, 227 F. Supp. 2d 1359, 1365-66 (N.D. Ga. 2002); *Khan*, 194 F. Supp. 2d at 1137.

The fact that there does not appear to have been any further progress on Petitioner's travel document since the Kenyan official indicated that a travel document would likely issue does give the Court some pause.  But, on this record, the present "lack of visible progress" on Petitioner's travel documents does not "show[] that there is no significant likelihood of removal; it simply shows that the bureaucratic gears . . . are slowly grinding away."  *Khan*, 194 F. Supp. 2d at 1137; *accord Fahim*, 227 F. Supp. 2d at 1366 ("The lack of visible progress since the INS requested travel documents from the Egyptian government does not in and of itself meet [the alien's] burden of showing that there is no significant likelihood of removal.").  Moreover, as stated in *Chen*, ICE "cannot reasonably be expected to give such a specific indication when the power to issue a travel document, and the timing of its issuance, ultimately rests with a foreign government."  2015 WL 4919889, at *5.  Thus, "the fact that ICE has not been able to provide a definite indication as to when it expects to obtain a travel document from the [Kenyan] government is not, in this Court's view, sufficient to satisfy [Petitioner's] burden at this time."  *Id.*  "[T]he reasonableness of detentions pending deportation cannot

be divorced from the reality of the bureaucratic delays that almost always attend such removals." *Fahim*, 227 F. Supp. 2d at 1367; *accord Chen*, 2015 WL 4919889, at *4 (*Zadvydas* did not involve temporary impediments to removal occasioned "by bureaucratic delays, setbacks, and ongoing negotiations with foreign governments").

Based on the foregoing, the Court concludes that, at this time, Petitioner has not shown good reason to believe that there is no significant likelihood of his removal in the reasonably foreseeable future and therefore has not met his burden under *Zadvydas*. As a result, Petitioner is not entitled to habeas relief. Nevertheless, the Court is mindful that Petitioner's post-removal detention has been considerable. It would certainly behoove the Government to increase efforts to effectuate Petitioner's removal "before time and circumstance suggest that removal is no longer reasonably foreseeable."[5] *Chen*, 2015 WL 4919889, at *6 n.8; *cf. Zadvydas*, 533 U.S. at 701. Accordingly, the Court recommends that the habeas petition be dismissed without prejudice.

[Continued on next page.]

---

[5] Again, for purposes of this Court's analysis in this Report & Recommendation and notwithstanding the Government's contention of evidence to the contrary, the Court has assumed Petitioner has been fully cooperative and otherwise complied with applicable laws. *See, e.g.*, 8 U.S.C. § 1231(a)(1)(C).

## IV. RECOMMENDATION

Based on all the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Petition for Writ of Habeas Corpus (ECF No. 1) be **DISMISSED WITHOUT PREJUDICE**.

Date: September_____9____, 2016          _____*s/ Tony N. Leung*_____
                                          Tony N. Leung
                                          United States Magistrate Judge
                                          for the District of Minnesota

                                          *Gathiru v. Banieke*
                                          Case No. 15-cv-4247 (DSD/TNL)

## **NOTICE**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.